UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

| | | |
|---|---|---|
| RONALD LAYNE WASSON | ) | |
| | ) | |
| v. | ) | 1:05-cv-69/1:03-cr-208 |
| | ) | *Chief United States District Judge Collier* |
| UNITED STATES OF AMERICA | ) | |

**MEMORANDUM**

Defendant Ronald Layne Wasson ("Wasson") has filed a *pro se* motion for post-conviction relief pursuant to 28 U.S.C. § 2255 (Court File No. 1). Wasson was convicted pursuant to his guilty plea of one count of possession of equipment and chemicals used to manufacture methamphetamine in violation of 28 U.S.C, § 842(a)(6) & (d)(2).

Wasson claims his plea of guilty was involuntary because he did not understand he was waiving his constitutional right to a jury trial. In support of this claim Wasson contends the Court found, by a preponderance of the evidence, that his sentence should be enhanced by three levels because his conduct created a substantial risk of harm to a human being which increased his sentence above the range covered by his plea agreement.[1] In his second claim, Wasson asserts he was improperly sentenced in violation of *Blakely v. Washington*, 542 U.S. 296 (2004) and *United States v. Booker*, 543 U.S. 220 (2005), when the Court enhanced his sentence using a preponderance

---

[1] Wasson is incorrect in his claim that his sentence was enhanced on the basis that his conduct created a substantial risk of harm to a minor. The specific offense characteristic that was applied to enhance Wasson's sentence was the Risk Enhancement pursuant to USSG § 2D1.1(b)(5)(B)–a three level increase for an offense involving manufacturing methamphetamine and creating a substantial risk of harm to human life.

1

of the evidence standard to find that his conduct created a substantial risk of harm to a human being. It actually appears that Wasson is making one claim– that the Supreme Court's decisions in *Blakely* and *Booker* rendered his guilty plea involuntary because his sentence had been enhanced under the federal sentencing guidelines based on additional fact-finding by this district Court under a preponderance-of-the-evidence standard rather than by a jury under a reasonable-doubt standard. However, the Court will address the issues as Wasson raised them in his § 2255 motion. The United States opposes the § 2255 motion.

After reviewing the record, the Court concludes that Wasson's § 2255 motion will be **DENIED**. The record conclusively shows that Wasson is not entitled to any relief under 28 U.S.C. § 2255. There is no need for an evidentiary hearing.

I.  **STANDARD OF REVIEW**

A federal prisoner may file a motion pursuant to 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence on the ground that the sentence was imposed in violation of the United States Constitution. To obtain relief under § 2255 based on an alleged constitutional error, Wasson bears the burden of establishing an error of constitutional magnitude which had a substantial and injurious effect or influence on the criminal proceedings. *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993); *Hill v. United States*, 368 U.S. 424, 428 (1962); *Griffin v. United States*, 330 F.3d 733, 736 (6th Cir. 2003); *Watson v. United States*, 165 F.3d 486, 488 (6th Cir.1999). To warrant relief under § 2255, Wasson is required to show a fundamental defect in the criminal proceedings which inherently results in a complete miscarriage of justice or an egregious error that rises to the level of a violation of constitutional due process. *Davis v. United States*, 417 U.S. 333, 346 (1974); *Griffin*,

330 F.3d at 736; *Gall v. United States*, 21 F.3d 107, 109 (6th Cir.1994).

II.     **PROCEDURAL HISTORY**

On September 23, 2003, a federal grand jury filed a four-count indictment charging Wasson with drug offenses. Wasson pleaded guilty to Count One of the four-count indictment. Wasson was sentenced to 80 months imprisonment for possessing equipment, chemicals, products, and materials used in manufacturing methamphetamine in violation of 21 U.S.C. § 843(a)(6). Wasson did not appeal, thus his March 11, 2004 judgment became final when the ten-day period expired within which he could have filed a notice of appeal. *See Nichols v. United States*, 285 F.3d 445, 447 (6th Cir.) (judgment is final ten days after entry where no direct appeal filed), *cert. denied*, 537 U.S. 1023 (2002). Wasson timely filed the instant § 2255 motion on March 15, 2005.

III.    **FACTS**

The following recitation of the facts is from the Presentence Investigation Report ("PSI"):

8.      On May 12, 2003, an officer with the Chattanooga Police department responded to a call involving a domestic disturbance at 4323 Cummings Highway, Chattanooga, Tennessee. Upon arrival, the officer was met by the defendant's girlfriend, Diane Watts, in the parking lot of the apartment complex. Ms. Watts told the officer that she had been living with Ronald Wasson in apartment #7, and that Mr. Wasson had thrown her belongings out of the apartment for no reason. Mr. Wasson saw the officer outside and opened the door to speak with him. The officer explained his purpose for being there and asked permission to come in the apartment to get his side of the story. Mr. Wasson initially denied the officer's request to come inside, but after being asked a second time, Mr. Wasson allowed the officer to enter the apartment. Upon entering the apartment, Mr. Wasson told the officer that Ms. Watts had ripped the curtains off the wall in the bedroom and living room. The officer observed several components used to manufacture methamphetamine sitting in plain view on and under the kitchen table (Red Devil Lye, Flask, and a Pyrex Dish containing suspect Ephedrine). When the officer entered the bedroom to investigate the allegations of Ms. Watts ripping the curtains off the wall, the officer observed the

3

following chemicals and components in plain view: blue tote box containing a funnel, Red Devil Lye, and rubber tubing; one length of large rubber tubing (approximately 3 feet long), burner plates, three layer liquid, and assorted glassware. Ronald Wasson and Diane Watts were arrested. Hamilton County Narcotics Detectives assisted the Chattanooga Police in taking samples of the lab and photographing all the evidence. The inventory log lists the following items, which in addition to the previously mentioned items were also found: 13 empty bottles (36 count) of Max Brand 60 mg. pseudoephedrine (25 mg. Ephedrine per tablet), used coffee filters, hydrogen peroxide, propane torches, Heet, jars with layered liquids, funnels, Coleman fuel, one gallon muriatic acid (90%), 16 ounces acetone (80%), hot plate with residue, heat lamp, rock salt, drain opener, and syringes.

9.      On September 11, 2003, while two Chattanooga Police (CPD) officers responded to 2531 Cummings Highway to assist the Chattanooga Fire Department in blocking traffic for an apartment fire, one CPD officer advised another CPD officer that warrants had just been taken out for Ronald Wasson who lived at 2531 Cummings Highway, Apartment #9 for Domestic Assault and Vandalism, in which Diane Watts was the victim. The second officer knew that Ronald Wasson lived in the apartment adjacent to the apartment that was on fire and had been previously involved in manufacturing methamphetamine. After the CPD finished directing traffic, an officer attempted to locate Ronald Wasson in Apartment #19. Mr. Wasson's vehicle was observed in front of Apartment #19, which led the officer to believe Ronald Wasson was possibly at home. The CPD officer requested a back-up unit and an officer with the Drug Task Force office arrived to assist him in trying to locate Mr. Wasson. The officer knocked on the door of Apartment #19, and after no response, he turned the door knob and noticed the door was unlocked, which further led the officer to believe Mr. Wasson was possibly inside the residence. The officer entered the unlocked door and upon entering noticed a strong chemical odor and a pyrex dish with coffee filters and white powder on top of the microwave in plain view from the doorway. Also in plain view was a bottle of butane gas on the bed. During a protective sweep of the apartment to ensure that Mr. Wasson was not hiding inside, several other items were observed which are used to manufacture methamphetamine. A small amount of marijuana was also noticed on the night stand located by the bed. Mr. Wasson was not located in the apartment. After a search warrant was obtained and executed, agents located an assortment of items and chemicals used to manufacture methamphetamine including: glass containers with layered liquids, hot plate, propane stove, stained coffee filters, iodine crystals, flasks, mason jars, rock salt, hoses, Coleman fuel, aluminum foil, butane, one empty bottle (36 count) Max Brand 60 Mg. pseudoephedrine (25 mg. per tablet), and Red Devil Lye.

10.     On October 15, 2003, Ronald Wasson met with Drug Force Task agents in regard to his participation in the manufacturing of methamphetamine and he waived

4

> his rights by signing a constitutional rights waiver. Mr. Wasson admitted that the two laboratories he was charged with were his, but he only cooked methamphetamine for his personal use. Mr. Wasson also admitted to selling small quantities and giving some methamphetamine to his girlfriend, Diane Watts, for her personal use. The defendant further advised that he has been cooking methamphetamine since he was laid off from work, approximately one year ago. Mr. Wasson advised that he has cooked at least every three weeks for the past year. Each cook has resulted in six to seven grams of methamphetamine, which would be a minimum of at least 104 grams of methamphetamine. According to the defendant, Dianne Watts was present at most labs that he ran and that she helped collect the necessary ingredients for cooking. Mr. Wasson told agents that he purchased most of his iodine in two ounce jars from Broadway Feed Store. Mr. Wasson also admitted to buying up to one pound of iodine at a time from Broadway Feed Store. The store clerk always asked the defendant what he was using the iodine for and Mr. Wasson stated that he routinely told the clerk that he was using iodine for his chickens and dogs. Ronald Wasson reported using liquid red phosphorous to produce the methamphetamine and purchased the red phosphorous from a party for $1 per gram and would buy approximately 25 grams at a time. Mr. Wasson told agents the name and place of residence for his source of red phosphorous.

(PSI, at 4-5).

## IV. ANALYSIS OF CLAIMS

Wasson raises two claims in his § 2255 motion. Wasson claims he is entitled to § 2255 relief because (1) his guilty plea was involuntary as he did not understand he was waiving his right to a jury trial and (2) in violation of *Blakely v. Washington* and *United States v. Booker*, his sentence was enhanced three levels when the Court concluded, by a preponderance of the evidence, that his conduct created a risk of harm to a human being(Court File No. 1).

### A. Involuntary Guilty Plea

Wasson claims he did not understand that he was waiving his Sixth Amendment right to a jury trial when he entered his guilty plea, thus rendering his plea involuntary. The Court finds this argument to be disingenuous. In support of this contention, Wasson claims the Court enhanced his sentence based on additional fact-finding under a preponderance-of-the-evidence standard which

5

resulted in his sentence being above the sentence covered in his plea agreement. Wasson is simply incorrect in his assertion that his sentence is above the maximum of the guidelines range identified in his plea agreement because his plea agreement provided that he could receive a sentence up to twenty (20) years.[2] Moreover, Wasson's factual explanation does not support his claim that he did not understand he was waiving his right to a jury trial.

Rule 11 of the Federal Rules of Criminal Procedure requires the district court to "address the defendant personally in open court...[and] inform the defendant of, and determine that the defendant understands ... the right to a jury trial...[and understands the consequences of] the defendant's waiver of these trial rights if the court accepts a plea of guilty." A petitioner "will rarely, if ever, be able to obtain relief for Rule 11 violations under § 2255," and such relief is available "only in the most egregious cases." *United States v. Dominguez-Benitez,* 542 U.S. 74, 83 n. 9 (2004). Rule 11 explicitly directs the district judge not to accept a plea without determining the defendant knows and understands the consequences of his guilty plea. The Court personally addressed Wasson, who was under oath, in open court and personally advised him that by pleading guilty he was giving up the right to a trial by jury and that his plea of guilty meant there would be no trial of any kind to which Wasson expressed he understood.[3] Thus, the Court explained to Wasson his right to a trial by jury

---

[2] Wasson's sentence of 80 months is well below twenty years (240 months).

[3] Moreover, prior to appearing before the Court to enter his plea of guilty, Wasson entered into a plea agreement with the government wherein he agreed to plead guilty to Count One of the indictment charging him with possession of equipment, chemicals, products, and materials which may be used to manufacture methamphetamine, knowing, intending, and having reasonable cause to believe that the items would be used to manufacture a controlled substance in violation of Title 21, United States Code, Section 843 (a)(6). The plea agreement was signed by Wasson. In addition, Wasson agreed that his case was governed by the Federal Sentencing Guidelines and that the Court would determine the appropriate sentence under the Sentencing Guidelines based upon the entire scope of his criminal conduct, his criminal history, and pursuant to other factors and

and that a plea of guilty would waive a jury trial.[4]   The plea agreement and the Court's review of its personal file in this case clearly establishes that Wasson understood he was waiving his right to a trial by jury and knowingly and voluntarily entered his guilty plea.  Wasson's factually unsupported claim that he did not understand he was waiving his right to a jury trial is disingenuous and not supported by the record.  Wasson does not claim counsel failed to explain to him that by entering a plea of guilty there would be no trial.  Nor does Wasson assert that the Court failed to explain to him that by entering a plea of guilty he was waiving his right to a trial by jury; thus, there would be no jury trial if he pleaded guilty.  Therefore, in light of the clear record, the Court concludes Wasson's claim that his guilty plea was involuntary because he did not understand he was waiving his right to a jury trial is without merit.

To the extent Wasson claims his sentenced was increased above the sentence covered by his plea agreement, he is simply incorrect.  Wasson received a sentence of eighty (80) months.  Wasson's plea agreement specified that he acknowledged that he understood "that his case is governed by the Federal Sentencing Guidelines" and that because he has a prior drug conviction, the penalties for the crime to which he pleaded guilty was "a sentence of imprisonment of up to twenty years[.]" (Court File No. 15, 1:03-cr-208).  Although the plea agreement provided that Wasson could receive up to a 240 month sentence of imprisonment, he only received an eighty (80) month sentence of imprisonment.  Consequently, Wasson's claim that his sentence exceeded the

---

guidelines as set forth in the Sentencing Guidelines.

    [4]       Since there was no direct appeal filed in this case, the re-arraignment hearing was not transcribed.  However, the Court follows a set procedure when accepting a plea of guilty.  The Court's personal file contains the procedure it followed in this case wherein it explained that by entering a plea of guilty, Wasson was giving up his right to a jury trial and that if he pleaded guilty there would not be a trial of any kind.

7

sentence covered in his plea agreement is also without merit. Accordingly, Wasson's involuntary plea claim will be **DENIED**.

B. *Blakely* and *Booker* Error

In his second claim, Wasson contends that under *Blakely v. Washington*, 542 U.S. 296 (2004) and *United States v. Booker*, 543 U.S. 220 (2005), his Sixth Amendment right to a fair trial was violated because his sentence enhancement for creating a substantial risk of harm to a human being was based upon the finding by the Court by a preponderance of the evidence rather than by a jury based upon a finding beyond a reasonable doubt. In effect, Wasson is arguing that based on the intervening change in the criminal law as articulated in *Blakely* and *Booker*, he is actually innocent of the three level enhancement for creating a substantial risk of harm to a human being because it was not based upon a reasonable-doubt standard. The Supreme Court's decisions in *Blakely* and *Booker* had not been decided at the time Wasson's conviction became final[5]. In addition, the Supreme Court has not expressly declared *Blakely* or *Booker* to be retroactive to cases on collateral review.

In *Blakely*, the Supreme Court held the Sixth Amendment prohibits sentences greater than "the maximum sentence a judge may impose solely on the basis of facts reflected in the jury verdict

---

[5] However, as the Sixth Circuit has previously explained "where developments in the law later expand a right that a defendant has waived in a plea agreement, the change in law does not suddenly make the plea involuntary or unknowing or otherwise undo its binding nature. A valid plea agreement, after all, requires knowledge of existing rights, not clairvoyance. '[A]bsent misrepresentation or other impermissible conduct by state agents, ... a voluntary plea of guilty intelligently made in the light of the then applicable law does not become vulnerable because later judicial decisions indicate that the plea rested on a faulty premise." *United States v. Bradley*, 400 F.3d 459, 463 (6th Cir. 2005) (quoting *Brady v. United States*, 397 U.S. 742, 757 (1970) (holding that a defendant could not claim his plea was involuntary by relying on a Supreme Court decision that declared unconstitutional a provision relevant to his criminal sentence).

or admitted by the defendant." *Id*. at 303. Applying the principles first announced in *Apprendi v. New Jersey* 530 U.S. 466, 490 (2000), and affirmed in *Blakely*, *Booker* found the system of enhancements established by the United States Sentencing Guidelines ("USSG") violates the Sixth Amendment. *See Booker,* 543 U.S. at 232-33. The Supreme Court resolved the conflict by excising the provision of the Sentencing Reform Act which made the USSG mandatory, 18 U.S.C. § 3553(b)(1), effectively rendering the Guidelines advisory. *Booker*, 543 U.S. at 244. Because Wasson brings a § 2255 motion, *Booker's* rationale is applicable only if its holding applies retroactively to cases on collateral review. [6]

*Booker* did not announce that it was retroactively applicable. In *Booker*, the Court noted that its holding should be applied "to all cases on direct review" but it did not state that the holding should be applied retroactively on collateral review to cases in which the judgment has become final. In fact, the Court quoted *Griffith v. Kentucky*, 479 U.S. 314, 328 (1987) for the proposition that "'a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases ... pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past.'" *Booker*, 543 U.S. at 268. The *Blakely*/*Booker* line of cases is essentially an extension of the procedural rules expressed in *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000) and *Ring v. Arizona*, 536 U.S. 584 (2002) which merely "allocate[d] decision making authority" with respect to sentencing, rather than stating a new substantive rule that may upset a judgement of conviction on collateral review. *See Schirro v. Summerlin*, 542 U.S. 348

---

[6] Although Wasson cites to *Blakely* and *Booker*, *Blakely* reserved judgment regarding the status of the federal sentencing guidelines. *Blakely*, 542 U.S. at 305 n. 9. Since *Booker* specifically considered whether the USSG violated the Sixth Amendment, the Court finds the appropriate question in this matter is whether *Booker's* rationale applies retroactively to cases on collateral review.

9

(2004) (holding that *Ring* established a new *procedural* rule that does not apply retroactively to cases already final on direct review).

The Sixth Circuit has specifically determined *Booker* is not applicable on collateral review. *Humphress v. United States,* 398 F. 3d 855 (6th Cir.), *cert. denied*, 126 S.Ct. 199 (2005). Neither *Blakely* nor *Booker* applies to persons such as Wasson, whose sentence became final prior to the *Blakely* and *Booker* decisions. Accordingly, neither *Blakely* nor *Booker* afford Wasson any relief on his challenge to the enhancement of his sentence on the bases that he created a substantial risk of harm to another human being and his § 2255 motion will be **DENIED**.

## V.  CONCLUSION

For the reasons set forth above, the Court concludes Wasson's conviction and sentence were not in violation of the Constitution or laws of the United States, and the motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255 will be **DENIED** (Court File No. 1).

A separate judgment order will enter.

**/s/**
**CURTIS L. COLLIER**
**CHIEF UNITED STATES DISTRICT JUDGE**